(No. 43972.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WALTER MONTGOMERY, Appellant.

*Opinion filed March 30, 1972.*

GERALD W. GETTY, Public Defender, of Chicago (MICHAEL WEININGER and JAMES J. DOHERTY, Assistant Public Defenders, of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HAMRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and GEORGE PAPPAS, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Walter Montgomery, was found guilty by a jury in the circuit court of Cook County of the offense of murder and sentenced to a term of 100 to 200 years in the penitentiary.

Defendant, then 17 years of age, was indicted along with four other boys for the offenses of murder and robbery. His motion for a severance was allowed and he was tried separately. The jury failed to return a verdict on the robbery indictment and the court, on that charge, declared a mistrial. This case, and *People v. Steptore, 51 Ill.2d 208,* arose out of the same occurrence.

On July 10, 1968, at 10:57 P.M., the Chicago Fire Department received a report of a fire at 1411 South Keeler. In the bedroom of the dwelling at that address, the firemen found the remains of the occupant, Marie Smrz. The witnesses who investigated the fire for the State testified that the fire had been started about 10:45 P.M., an accelerant had been used, and the blaze had been confined to the bedroom. They had found drawers of a dresser in the dining room opened and a jewelry drawer pulled out.

Robert Harris testified that he was acquainted with Mrs. Smrz and on the evening in question was working in a nearby garage when he noticed the fire in her house. He

ran to her house, kicked down the front door, and because of the smoke crawled through the house into the bedroom, where he saw Mrs. Smrz lying in flames on her bed. He was unable to assist her because of the smoke and fire. He testified that the fire was confined to the bedroom area and that the rear door of the house was standing open. He also identified defendant as being someone whom he had seen in front of the house when he came out.

Willie McLaughlin testified that he knew defendant by a nickname and that he along with defendant and Ike Steptore had entered the back door of Mrs. Smrz' house about 9:30 that evening by kicking in the glass and unlocking the door. While defendant searched the house for guns or money, the witness took a clock radio, and the boys then left the house. Subsequently, they met several other boys, including Willie Coleman.

Coleman testified that on that evening he met defendant and some other young people and they all proceeded to the back yard of the home of one of the boys, Robert Dismukes. The Dismukes home was two houses away from the Smrz house. Darryl Allen joined them there and he had with him a bottle containing 150 proof rum. While the witness and his girl friend, Delores Johnson, remained together in Dismukes' back yard, the other boys, including defendant, entered the Smrz house. A few minutes later, Dismukes and Steptore left the house and went down the stairs leading from the back porch. Defendant was then standing on the porch. Dismukes yelled at defendant, who re-entered the house. A few minutes later the witness saw defendant, Allen and one other person leave the house. Coleman then walked with Delores Johnson to her home and shortly thereafter returned to the Dismukes house where he heard that the Smrz house was on fire.

Delores Johnson, who was 13 years old, testified that she saw defendant and the others enter the Smrz house and saw Dismukes and Steptore exit shortly afterwards.

Barbara Walton testified that she lived in the same building as Dismukes and knew the defendant. She stated that about two weeks after the fire defendant admitted to her that he and some other boys had entered Mrs. Smrz' house to look for money and that she had awakened and seen them when they were in the bedroom. Defendant said that he was "scared" she would tell, so he poured alcohol on the bed, threw a match on it, and left.

Robert Dismukes and Darryl Allen, both of whom were indicted with the defendant, when called by defendant, testified that they did not know him on July 10, 1968, and had met him after they were all arrested and jailed. Defendant testified that he did not know Allen, Dismukes or the other two boys indicted with them prior to his arrest, and denied being involved in the death of Mrs. Smrz. He testified that on July 10, he was in the Willie Bea Lounge from 6:30 in the evening to one o'clock the next morning. Charles Smith, the bartender at the Willie Bea Lounge, testified that defendant was there from 8:00 P.M. until midnight. In rebuttal, the People called Detective Edward Spellar who testified that he had interviewed Smith in the course of investigating the murder and that Smith had told him he did not know the defendant or anything about the case.

Defendant contends that the judgment must be reversed for the reason that the circuit court erred in denying his motion to suppress his written statement and thereafter committed reversible error in permitting it to be used in impeachment. He argues that the statement was taken in violation of his rights under the fourth amendment in that it was made during a period of illegal confinement following his being arrested without probable cause. He contends also that he was not given the warnings required by *Miranda v. Arizona (1966), 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602,* and the statement was taken in violation of his rights under the fifth and sixth amendments. He argues further that the circuit court erred

in its ruling on the motion to suppress in that it attempted to apply a rule other than that of *Miranda* because defendant's statement, the court said, was exculpatory and not inculpatory.

The record shows that on July 31, 1968, defendant was arrested without a warrant, by three detectives, at his mother's home. He was taken to the Maxwell Street Station where his question and answer statement was taken by Detective Louis Denson. In the statement defendant admitted being at Mrs. Smrz' back door with Dismukes and Steptore. He stated too that four boys, including Willie Coleman, went into the house and when Coleman came out he was carrying a white radio. Defendant denied that he entered the house at any time. The record reflects that the contention that defendant was arrested without probable cause was not made in the motion to suppress, during trial, or in a post-trial motion, and the issue was raised for the first time in this appeal. Although, under similar circumstances we have held that the claim of error was waived *(People v. Nilsson (1970), 44 Ill.2d 244)*, because of the youth of the defendant we are reluctant to invoke the doctrine of waiver. Although the record shows no exigency which would have precluded obtaining a warrant prior to making the arrest, and to do so would have been advisable, it appears that at the stage of the investigation at which this defendant was arrested the police were possessed of sufficient information so that there was probable cause for his arrest. Furthermore, the record, contrary to defendant's contention, shows adequate *Miranda* warnings prior to and during the taking of the statement. Assuming, *arguendo,* that the arrest was made in violation of defendant's fourth amendment rights in that it was made without a warrant and without probable cause, we hold that in the absence of a search and seizure issue, and in view of adequate *Miranda* warnings, the error, if any, was beyond a reasonable doubt, harmless. *(Chapman v. California (1967), 386 U.S. 18, 17 L.Ed.2d*

*705, 87 S.Ct. 824.)* We hold further that even assuming that the trial court, as contended by defendant, misinterpreted *Miranda,* its ruling was not error, and whatever the basis, the correct ruling will not be disturbed.

Defendant contends next that the trial court erred in denying his motion to produce the memorandum made by an assistant State's Attorney during his interview of Willie McLaughlin. McLaughlin's name was included in a list of witnesses furnished defense counsel with "address unknown." There appears to be no question that he had resided at 4414 South St. Louis Street in Chicago since at least the date of Mrs. Smrz' death. Defendant's attorney objected to his being permitted to testify; the court overruled the objection and granted counsel time to question the witness prior to his being called to the stand. During cross-examination of the witness it was shown that the assistant State's Attorney had made the memorandum in question and defense counsel asked that it be produced. Without ascertaining that there was a memorandum the court denied the request. Clearly, the holding in *People v. Wolff (1960), 19 Ill.2d 318,* required that the court ascertain that there was such a document and examine it *in camera,* and the failure to do so was error. The record shows, however, that McLaughlin's testimony covers only the period during which the first entry into Mrs. Smrz' home was made and is relevant only to the robbery charge. Under the circumstances the error was not so prejudicial as to require reversal. We note parenthetically that Rule 412 provides disclosure and *in camera* inspection of the type of memorandum here involved, and the error is not likely to recur.

Defendant contends next that the circuit court erred in permitting Delores Johnson, 13 years of age, to testify without determining her competency as a witness. The record reflects no objection made by defendant at the time, and although we have held that the issue may not be raised for the first time on appeal *(People v. Matthews, 17*

*Ill.2d 502),* we have examined her testimony and find that she was obviously competent to testify.

Defendant contends next that he was denied his constitutional right to be confronted with the witnesses against him when the court, over his objection, permitted the People, under the guise of impeachment, to introduce into evidence statements allegedly made by two co-defendants, and which they denied making. He contends, further, that the statements in addition to incriminating the defendant were inflammatory in nature and were prejudicial.

The witnesses in question were Robert Dismukes and Darryl Allen, both of whom were indicted with defendant for the offenses for which he was on trial. The record shows that Dismukes was interviewed in the warden's office in the Cook County jail on the afternoon of Sunday, February 9, 1969, by the assistant State's Attorneys who tried this case. The trial of this case had commenced on February 5, 1969, and was then in recess over the weekend. Dismukes was in custody awaiting trial and the record shows that no effort was made to advise his attorney that he was to be interviewed. In marked contrast, we note that one of the assistant State's Attorneys involved, when defense counsel in this case sought to interview Willie McLaughlin prior to his testifying, carefully advised McLaughlin that, he could, if he so desired, have the State's Attorney present during the interview.

The People called Norman Dunigan, a block sergeant at the Cook County jail, as a rebuttal witness. The conversation to which Dunigan testified in this case is the same one to which the assistant State's Attorney testified in the Steptore case. The impropriety committed here is reduced in degree only to the extent that in this case a jail officer rather than an assistant State's Attorney was the impeaching witness. Despite the obvious impropriety, we need not and do not decide whether admitting the

testimony was error because, for reasons hereafter discussed, this judgment must be reversed and the cause remanded.

The record shows that Darryl Allen, called by defendant, testified that he along with defendant, Steptore, Dismukes and Gregory Dyson were charged with the robbery and murder of Mrs. Smrz, and that after consulting with his attorney, and knowing that he was not required to testify, had decided to do so. At the time of trial he was an inmate of the Cook County jail. He testified that he had not known the defendant on July 10, 1968, and that he met him for the first time when he, Allen, entered the Cook County jail on September 11, 1968. On cross-examination he was asked whether, upon being arrested on August 2, 1968, he was interrogated by Detective George Sams. He was then asked, over objection, whether he had made the following statements: "Maniac [the defendant, Montgomery] went up in the front room hollering at the old lady, asking her where she had the money. *** The old lady started to scream. Maniac Montgomery hit her and knocked her down. *** I told Maniac to stop and he told me to stay outside and watch out for them. *** Then Maniac started to kick the old lady. *** The old lady was still on the floor and was crying, 'Oh, dear God, somebody please help me.' *** I told Maniac, 'Leave her alone; leave her alone.' *** Maniac came running out and told all of us, 'Come on, man, let's get away from here.' As he was talking to us I noticed smoke coming from the old lady's house. *** I met Maniac on the corner of 1400 South Keeler and that is when he told me that if I told anybody about what happened he would kill me. *** Maniac said, 'Look boy, you better not tell anybody about what happened in there tonight or I will kill you.' *** Maniac checked the whole house and beat and kicked the old lady and when everybody else ran out, Maniac was still kicking her asking her where she had the money. She was still begging for

mercy when I ran out." He denied making any of the statements. The court sustained an objection to the following question: "Did you admit any of these things to me in my office when you talked to me?"

In rebuttal, Detective Sams testified that upon arresting Allen he took him to the Maxwell Street Station where Allen, after being advised of his right to remain silent, made an oral statement. The following ensued:

"A. —he stated that he met the Defendant at 14th and Keeler and it was suggested that they go into the old lady's house a few doors away, that she had some money and they would rob her. He said at this time he along with the Defendant and others approached the rear door of the old lady's house, she was standing inside of the door and that the Defendant Montgomery kicked open the rear door, they all rushed in.

Q. Did he know the Defendant Montgomery by any other name to your knowledge?

A. He did.

Q. What was that name?

A. Maniac.

Q. Continue.

A. He said when they rushed in the house he stopped in the kitchen, Maniac continued on to the front of the house and the old lady went back up in the front room. He said at this time Maniac began to ask the old lady where is the money, where is the money and she says, 'I have no money, I have no money,' he said at this point Maniac hit the old lady and she fell down. He said at this point he hollered and told Maniac leave her alone, leave her alone, he said Maniac told him to go outside and watch, 'You go outside and watch,' he said at this point Maniac began to kick the old lady and she hollered, 'God, somebody help me, somebody help me,' and he rushed from the house.

Q. Did he say whether anyone else was in the house other than the Defendant and himself?

A. Yes, he did.

Q. Who did he say was in the house?

A. He said Skidrow was, Steptore, Shine, Robert Dismukes, and a member of his group Baby Dyson who is Gregory Dyson."

Citing *People v. Collins (1971), 49 Ill.2d 179, People v. Moses (1957), 11 Ill.2d 84,* and *People v. Biloche (1953), 414 Ill. 504,* the People argue that the evidence of Allen's prior inconsistent statement was admissible to impeach his credibility and that its purpose was not to prove the facts stated by the witness but to cast doubt on his testimony. This contention correctly states the general rule but our examination of the record persuades us that the trial court permitted the cross-examination to go far beyond the limits of a proper foundation for impeachment and permitted the witness to testify to statements which could only have served to confuse and prejudice the jury. The cases of the defendant and his co-indictees were severed primarily because of the difficulty anticipated in assuring fair trials as the result of the conflicts resulting from implicatory statements. In *People v. McKee (1968), 39 Ill.2d 265,* this court reversed a conviction in a bench trial holding that it was impossible for the trial court and counsel in that case to "disabuse" their minds of the evidence which was admitted, not as proof of fact, but as impeachment. That even the trial judge here was unable to do so is shown by the fact that prior to imposing sentence he said, "I might say this to you: Counsel has made an eloquent plea, but I am wondering in my own mind if some future generation, some parole board will show you more mercy and compassion than you showed Mrs. Smrz on the night of that fire. You left her to die. She even pleaded to God for help." The only evidence of such an occurence is in the cross-examination of Allen and the impeachment testimony of the police officer. We conclude that no cautionary instruction was sufficient to enable the

jury to do what an able experienced trial judge was unable to do, and under the circumstances the cross-examination and impeachment were so prejudicial as to deprive defendant of a fair trial.

Defendant contends finally that the evidence does not prove him guilty beyond a reasonable doubt. The contention is without merit since the record contains sufficient evidence to sustain the conviction. This court is reluctant to reverse a judgment supported by ample evidence but in our opinion the admission of the inflammatory testimony adduced in impeaching Allen deprived defendant of his constitutional right to a trial by a fair and impartial jury. For the reasons stated the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

*Reversed and remanded.*