THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAURICE WILLIAMS, Defendant-Appellant.

(No. 56865;

First District (1st Division)—December 3, 1973.

James J. Doherty, Public Defender, of Chicago (Emanuel Logalbo and Stanton Bloom, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, Mariann Twist, and Nicholas P. Iavarone, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

After a bench trial, the defendant was found guilty of indecent liberties with a (male) child and was sentenced to four to ten years in the Illinois State Penitentiary. On appeal he contends: (1) that certain testimony of a police officer was hearsay and should have been stricken; (2) that, without that corroborative testimony, the remaining testimony of the complaining witness Cornelius Hodges was not such as to establish his guilt beyond a reasonable doubt; and (3) that he was entitled to be discharged on the affirmative defense that the boy involved was a "prostitute."

We do not agree with any of these contentions and affirm.

The initial witness for the prosecution was Police Officer Finn. Finn told how Williams was arrested, brought to the 21st district station, advised of his constitutional rights and questioned. Present at the interrogation besides Finn and Williams were the complainant, Cornelius Hodges, and his mother. In response to Finn's questions, Cornelius told of the events that precipitated Williams' arrest. Over the defense's objection on hearsay, the trial judge permitted Finn to relate what Cornelius had told him, that "on several occasions the defendant had taken him to the project area between the eleventh and thirteenth floors and had him drop his pants. He was told to take his pants down at which time defendant placed his penis between his legs and pumped on him for a period of time until a climax was reached, at which time they all left the area together."

The officer further stated that Cornelius told him that this had occurred to him at least three times, once in April, 1971, and twice in August, 1970. However, on cross-examination Cornelius spoke of only two incidents. Cornelius also told Officer Finn that he had been offered money if he would submit to these actions—five dollars, and that he was offered money on each occasion. Finn further stated that Mrs. Hodges said Cornelius had told her about Williams' August, 1970 actions in August, 1970, but she never told the police about that until May, 1971. The State also called Mrs. Martha Williams, the defendant's mother, who stated that her son Maurice was born on March 14, 1943, in Indianapolis, Indiana.

Mrs. Annie Hodges testified that Cornelius and Tyrone Hodges are her sons, that they both live with her presently and that they are thirteen and ten years old, respectively. She related that she met Williams in August, 1970, and that her boys were working for him. On cross-examination, she stated that Williams had been in her home and that prior to May, 1971, she had never made any complaint against him.

The concluding witness for the State, was the complainant, Cornelius

Hodges. He stated that he was ten years old, but on cross-examination stated that he was twelve at the time of the incident. He testified he first became acquainted with Maurice Williams when he and a boyfriend, twelve-year-old Sylvester Green, were returning from the grocery store in the summer of 1970. Cornelius said that Williams asked both boys if they wanted a job delivering groceries for $5.50 a week. Both boys said yes, but Cornelius wanted to tell his mother about the offer and deliver some groceries to her. The mother, according to Cornelius, wanted to see Williams but did not make any effort to call him.

Cornelius further testified that later in the summer of 1970, Williams took him and Sylvester Green to Goldblatt's, whereupon Williams told Sylvester to remain at Goldblatt's, and he and Williams went to a project building on Calumet and went up to the thirteenth floor. Cornelius said Williams told him that "if you got blue ball around your private, that you got to go to the hospital to get a shot. He said he don't want to go to the hospital so he would go between my legs * * *." On cross-examination, Cornelius related another blue ball story, "He [Williams] had stopped in the hallway and then he said, don't you remember that day I had told you I had got a girl, a little piece from a girl, and I had gotten the blue ball around my private."

Cornelius related that Williams told him to lower his pants, and when Cornelius did this, Williams stuck his private between his legs. According to Cornelius, Williams further told Cornelius to move around, which Cornelius did for five minutes, and then Williams gave him "a piece of paper to wipe off between my legs." Cornelius also testified that "the first time he gave all of us $3 apiece." But on cross-examination, Cornelius stated he was supposed to get $5.50, but "he never gave it to me." Cornelius asked about the money, but Williams was to have said, "I ain't got it." Cornelius did state that he later received $3, but he thought Williams gave it to him for the fun of it.

The following day, Cornelius met Williams again, and on this occasion Williams took Cornelius and five other boys to the playground. Sylvester Green was again along and also Barry Sharkey and Tullo and Tiny; Sylvester and Barry were listed as witnesses on the indictment. Cornelius stated that Williams left the playground with Barry Sharkey and went to the project on Calumet, returned to the playground with Barry and took them all home.

After having seen Williams numerous times, Cornelius indicated that he next saw Williams on April 16, 1971. Cornelius stated he met Williams at the same project building, and Williams stated he was going to get some keys from his cousin and to meet him on the eleventh floor. Williams then told Cornelius "that he never did dislike me [Cornelius],"

and then similar circumstances as occurred nine months earlier were related. On this occasion, Cornelius was not paid for his services; "and on April 16, did he give you any money?" "No." Cornelius told the Assistant State's Attorney he knew what Williams was doing on April 16, 1971, and again told the court, in response to defense counsel's question, that he knew what was going to happen on April 16, 1971. Defense counsel, in an effort to show Cornelius' lack of innocence, asked several questions: "You know what sex is, don't you?" and "Did you know where babies came from?", which were objected to by the State and sustained by the court.

Cornelius said that on April 16, 1971, he never saw Williams' penis, but concluded that Williams stuck this between his (Cornelius') legs. He indicated that Williams had no weapon.

In response to the prosecutor's question as to why Cornelius didn't tell his mother, Cornelius stated, "I had told her once, but she didn't notice until it was on Friday, my brother told her." On cross-examination, Cornelius said that Williams told him if he ever said anything about the August, 1970, incident, he would shoot him. He never told the police about this until his mother complained to the police in May, 1971.

The defendant took the stand and testified that he did not recall where he was on April 16, 1971, but he did not see Cornelius Hodges on that day. The defendant did state that he was with a boy named Ray Temple all day on April 16, 1971.

After a bench trial, Williams was convicted on the charge of indecent liberties with a child and was sentenced to four to ten years in the Illinois State Penitentiary.

■■ Passing now to the defendant's first contention that certain testimony by Officer Finn was hearsay and should have been stricken on defendant's motion, this contention is without merit in that the statements were not hearsay because they were not introduced to prove the truth of the matters therein recited but merely to corroborate the sincerity of the complaining witness by showing that he complained of the defendant's action.

■■ But even if Officer Finn's testimony did tend to prove the truth of the facts therein recited, it falls within a well recognized exception to the hearsay rule in that both the child (concerning whose statement the officer testified) and his mother confronted the defendant in open court and were subject to cross-examination.

In *People v. Carpenter* (1963), 28 Ill.2d 116, 190 N.E.2d 738, in affirming the judgment, our supreme court, at page 121, said:

"* * * The fundamental purpose of the hearsay rule was and is to test the real value of testimony by exposing the source of

the assertion to cross-examination by the party against whom it is offered. While the administration of an oath and the right of confrontation are also spoken of as necessary elements, the essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the act asserted. (Wigmore on Evidence, 3d ed. sec. 1361, *et seq.; People v. Smuk,* 12 Ill.2d 356.) If this requirement is met, with the exception of instances such as those where the silence of the defendant is claimed to constitute an implied admission, the presence or absence of the defendant is immaterial.

The distinction between admissible testimony and that which is barred by the hearsay rule is well illustrated by Wigmore's example of the witness A testifying that 'B told me that event X occurred'. If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible—if offered to prove that event X occurred, it is clearly inadmissible, for the only probative value rests in B's knowledge—and B is not present to be cross-examined.

Here the witness Jackson was present in court. * * *"

In *People v. Hoffmann* (1970), 124 Ill.App.2d 192, 260 N.E.2d 351, in affirming, this court, at pages 195-196, stated:

"Testimony in court of a statement made out of court, offered as an assertion to show the truth of the matters asserted and thus resting for its value upon the credibility of the out-of-court asserter, is hearsay evidence and inadmissible. People v. Carpenter, 28 Ill.2d 116, 190 N.E.2d 738 (1963). The rule is inapplicable, however, if the same matter has been competently testified to by the out-of-court asserter himself.

We have dealt with this problem in other cases. In People v. Burks, 105 Ill.App.2d 112, 245 N.E.2d 120 (1969), the defendant objected to testimony by a police officer that the victim of a rape exclaimed, 'That is the man right there' upon seeing the defendant after her assault. Prior to his testimony, the prosecutrix had testified that she had pointed out the defendant to the police as the man who raped her. We held that no error was committed since the victim confronted the defendant in court and was subjected to cross-examination. In People v. James, 109 Ill.App.2d 328, 248 N.E.2d 777 (1969), the victim of a robbery testified to identifying the defendant and a stolen watch in the police station shortly after the offense. Later in the trial, a police officer testified

to the same identification. We noted that the identification testimony by the police officer merely repeated what already had been proven by the victim's testimony and held it harmless. See also People v. Smith, 105 Ill.App.2d 8, 245 N.E.2d 23 (1969) and People v. Poole, 121 Ill.App.2d 233, 257 N.E.2d 583 (1970)."

And in *People v. Keller* (1970), 128 Ill.App.2d 401, 263 N.E.2d 127, in affirming, this court said, at 408-409:

"Following the analysis of the hearsay rule set forth in Carpenter, we have recently held that if the person who made the out-of-court identification is present, testifies to his prior identification and is subject to cross-examination, the purpose of the hearsay rule is satisfied. People v. Hoffmann, 124 Ill.App.2d 192, 260 N.E.2d 351; People v. Poole, 121 Ill.App.2d 233, 257 N.E.2d 583; People v. Burks, 105 Ill.App.2d 112, 245 N.E.2d 120. This is in accord with the present trend which is to accept such testimony as evidence of the truth of the matter therein asserted if the declarant is present and subject to cross-examination. Model Code of Evidence, Rule 503 (1952). See Uniform Rules of Evidence, Rule 63 (1) (1953); Cal Evid Code, § 1238 (West 1966); Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Preliminary Draft of Rules of Evidence for the United States District Courts and Magistrates, Rule 8—01(c) (2) (iii) (March 1969). We conclude that it was not error for the trial court to admit the testimony of the police officer with respect to Mukahirn's identification of defendant."

■■ But even if we were to conclude that such testimony was inadmissible, there would be no need to reverse on that ground because the testimony of the complaining witness was clear and convincing and thus entirely sufficient in itself to sustain the conviction, and such testimony need not be corroborated. *People v. Wright* (1972), 3 Ill.App.3d 829, 279 N.E.2d 398.

It is plain from the record that the judge in this case found the complainant's testimony to be just that, when he stated:

"The Court has listened to many witnesses over many years and I cannot recall ever being more impressed with the testimony and with credibility and truthfulness, and the ability to observe the reasonableness of the testimony as I heard it from the lips of Cornelius Hodges a young man of 13 years of age.

He testified truthfully. There is very little doubt in the court's mind that Cornelius Hodges believed that he was going to be hired as a grocery delivery boy, and that he did not give or take part in the act complained of primarily for economic gain.

On the other hand, Maurice Williams seems to remember nothing, and offers very little in defense."

■■ This statement also is dispositive of the defendant's third contention—that the complainant's own testimony raised the affirmative defense that the child was "a prostitute." In *People v. Brown*, 132 Ill.App. 2d 875, 878, 271 N.E.2d 395, this court discussed a similar problem and concluded that the term "prostitute," in this context, "has the common denominator of indiscriminate sexual intercourse or other lewdness, usually for hire." We feel that the trial judge's determination of the complaining witness' demeanor negates this defense.

It would be a travesty on justice to allow the defendant to hide behind his gift of $3 to a sexually immature boy, such as the complainant here.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.