THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEVE STRUBBERG, Defendant-Appellant.

Fifth District No. 76-298

Opinion filed May 12, 1978.

Ralph Ruebner and Allen L. Wiederer, both of State Appellate Defender's Office, of Elgin, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and Martin Ashley, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Steve Strubberg, was convicted by a jury of murder and burglary and was sentenced to terms of 75 to 150 years, and six years eight months to 20 years, respectively, for those offenses. On appeal the defendant contends that to his prejudice inadmissible hearsay evidence was admitted, improper cross-examination was allowed and the sentence imposed was excessive.

It is necessary to summarize the evidence presented. At about 8:30 on the morning of February 6, 1976, the body of a 78-year-old woman was found in her home lying on her bed with her skull crushed. Three persons were arrested in connection with the murder, all of whom resided in the same neighborhood as the victim. The three were Steve Strubberg, age 18, John Henderson, age 15, and Jack Robertson, age 14.

Henderson and Robertson, who was Strubberg's brother-in-law, agreed to testify against Strubberg in exchange for the prosecutor's promise not to prosecute them as adults. At trial Robertson and Henderson testified that Strubberg planned the burglary and killed the woman. Strubberg testified that his only involvement was to attempt to "talk them out of it" and when he was informed later that they had beaten the woman and taken her purse in his absence, he went to her house to see if she really was dead.

Jack Robertson testified for the State that Steve Strubberg was married to his sister, Diane Strubberg, and that the couple and their infant child lived in the same household with him and his mother and a second sister.

Before Christmas, Robertson had sold greeting cards to the victim and noticed that she had "a lot of money." Robertson, Henderson and Strubberg had discussed ways to get the money from her about two days before the murder.

On the night of February 5, Strubberg called Robertson about midnight asking if he still wanted to break into the woman's house. Robertson replied that he would decide when Strubberg came home. Strubberg returned about 2 a.m. and Robertson told him he wanted to go ahead with the plan. Strubberg asked Robertson to borrow a screwdriver, coat, gloves and hat from Henderson. Robertson called Henderson who agreed to loan the items and Robertson went over to get them. When he returned he and Strubberg went to the woman's house where Strubberg cut the screen door and then used the screwdriver to pry off some pieces of wood and remove a pane of glass on the inner door so he could reach in and unlock it. Strubberg then went into the bedroom carrying Robertson's baseball bat but came back out saying he "couldn't do it" and asked Robertson to hit her. When Robertson refused Strubberg went back in and hit the woman several times. Robertson grabbed the woman's purse and told Strubberg they had to go but Strubberg went back into the bedroom saying that he had to make sure she was dead and Robertson heard him hit her several times more. Robertson then ran back to his house and Strubberg came in five or 10 minutes later.

Robertson took the money out of the purse and threw the purse on the roof. Strubberg took the money saying that he had killed the woman and he deserved it. He asked Robertson to go get the bat which he had left behind but Robertson refused. Strubberg then called Henderson and asked him to go get the bat and also bring back Strubberg's cigarettes and the screwdriver and one glove. Henderson said that he would go after curfew lifted at 6 o'clock.

Henderson came to the Robertson house shortly after 6 a.m. and he and Robertson went to the woman's house, turned on the light, picked up the bat and on the way home found the other items which they brought back to the Robertson home. They took the bat into the bathroom, washed it off and placed it in the utility room. After going home for a few minutes Henderson returned to the Robertson house where he watched television with Robertson until they were arrested at about 10 that morning. During that time the two boys discussed the details of what Robertson and Strubberg had done at the victim's house.

Henderson testified for the State as to his participation in this same series of events. There were some minor differences as to details but the testimony by Henderson was essentially a repeat of what Robertson had said on the witness stand.

Diane Strubberg testified for the defense that when she went to bed at

10:30 or 11 o'clock on February 5, 1976, Steve was out with a friend. When she got up on the morning of February 6 at about 4:45 to feed the baby Steve was there but she did not know what time he had arrived. Sometime later that morning, whether before or after Robertson and Henderson were arrested is not clear, she noticed some "little spots" on Steve's jeans and "threw them in the wash." She replied in the negative to a series of questions asked by the prosecutor as to conversations allegedly had with her sister, Robin Wren, and her mother-in-law, Phyllis Strubberg, about the jeans and the origin of the spots. She also denied having any conversation with Robin Wren in which she reported overhearing Steve admit the killing and that he had admitted it to her.

Robin Wren testified for the State that she was present in the Robertson home when the three boys were discussing a house they planned to rob. She indicated that she had returned to the home on the morning of February 6 and found Diane washing clothes. Diane had drawn her attention to some spots on a pair of jeans which she (Robin) thought looked like blood. In rebuttal testimony Robin further testified that Diane told her she had overheard Steve say to John (Henderson) on the telephone that he had killed a woman.

Steve Strubberg testified in his own defense that there had been some conversation between Robertson, Henderson and himself about robbing the "old lady" in which he had attempted to persuade the other two that they should find someway to get the money without hurting the woman such as breaking out a window and hooking the purse with a long stick. He had gone to her house on the day before the murder and thrown a coke bottle through the window so Henderson and Robertson could see that they could do that.

Defendant further related that on the day of February 5 Henderson and Robertson had been taking "speed" pills and were "talking crazier and crazier." He, defendant, left that evening to drink coffee with a friend because he did not want to be around the other two and later went to a tavern where he stayed until closing time around 2 a.m. When he returned home a little after 2 o'clock the two boys were sitting at the kitchen table counting money, some of which they handed him. They said that they had "robbed that old woman." After hearing this he went to the victim's house, found the door standing open, went in and saw that she was dead. When he got back home Henderson was gone. He saw his jeans, the bottoms of which were wet, lying on the kitchen floor beside his boots. Robertson was in the utility room scraping paper off some bottles and crushing the bottles into the trash can. (There had been earlier testimony by a police officer that parts of plastic pill bottles identified as belonging to the victim had been found in that trash can.) He then went upstairs to bed.

Defendant first argues that error occurred in the cross-examination of Diane Strubberg when the prosecutor questioned her about prior statements, allegedly made to the police and to Robin Wren, that Steve had "told his Mom he thinks he killed a woman"; that he had said to her (Diane) that "he was in on it"; "he remembered hitting her a few times"; and "all he could say was that he killed a woman." No evidence was presented by the prosecution that Diane had made these statements.

Defendant contends that it is apparent that the prosecutor's cross-examination of Diane Strubberg was designed to insinuate that defendant had told her and his mother that he committed the alleged offense and that Diane related such incriminating statements to Robin Wren, Phil Weber, an assistant State's Attorney, and Officer Don Knight. Defendant asserts that no evidence was offered, or even available, to refute such insinuations and they were, therefore, improper, prejudicial, and require reversal. Defendant cites *People v. Irish*, 77 Ill. App. 2d 67, 222 N.E.2d 114; *People v. Orr*, 45 Ill. App. 3d 660, 259 N.E.2d 1237; *People v. Richardson*, 42 Ill. App. 3d 663, 356 N.E.2d 583.

■■ We agree with the defendant that if a cross-examiner lays a foundation for impeachment of a witness in a manner which insinuates that the witness made prior inconsistent statements, and does not subsequently present evidence that those statements were actually made, error has been committed, and that general rule is applicable here. However, the fact that error has occurred in this regard does not alone carry the import that it is prejudicial and requires reversal.

In the cases which have found the improper unsupported insinutations of guilt to constitute prejudice and require reversal the insinuations were substantial, repeated and definitely prejudicial. (*People v. Hawkins*, 61 Ill. 2d 23, 329 N.E.2d 221; *People v. Nuccio*, 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Richardson.*) We find that the attitude taken by Illinois courts in this situation is best expressed by the following from *People v. Nuccio*, 43 Ill. 2d 375, 396, 253 N.E.2d 353:

> "Where, as here, the guilt of the accused is not manifest, but is dependent upon the degree of credibility accorded by the trier of fact to his testimony and that of the witnesses who testify on his behalf, and there appear in the record substantial numbers of unsupported insinuations which, if considered, could have seriously impeached the credibility of the defendant and his witnesses, and there is no indication of the court's awareness of this impropriety even though it is brought to his attention, it is our opinion that justice and fundamental fairness demand that the defendant be afforded a new trial free from such prejudicial misconduct."

In contrast to the situation in *Nuccio*, the guilt of the defendant in this

case is manifest and it is not apparent that the unsupported innuendoes contributed to the verdict of guilty. To the contrary, defendant's guilt was overwhelmingly established by the testimony of Jack Robertson who was with defendant when he did the killing and gave a graphic description of the defendant's actions at the scene. John Henderson loaned defendant a coat, a pair of gloves and a screwdriver to use in the crime and testified that defendant admitted the killing to him and asked him to return to the scene to pick up items defendant had left behind. Richard Williams, a completely disinterested witness, testified that while he was a cellmate of defendant in the Clinton County jail defendant admitted he had killed the old lady by saying on more than one occasion, "I did it but they can't prove it."

■■ In light of this proof of defendant's guilt we deem the unsupported insinuations to constitute harmless error. *People v. Goolsby*, 45 Ill. App. 3d 441, 4 Ill. Dec. 38; *People v. Telio*, 1 Ill. App. 3d 526, 275 N.E.2d 222; *People v. Williams*, 105 Ill. App. 2d 25, 245 N.E.2d 17; *People v. Snell*, 74 Ill. App. 2d 12, 219 N.E.2d 554.

Defendant next contends that prejudicial and reversible error occurred when the court permitted the prosecution to present damaging hearsay evidence under the guise of impeachment by allowing Robin Wren to testify that Diane told her that she overheard defendant tell John (Henderson) he had killed a woman.

Diane testified on direct that defendant left their residence at 6:30 or 7 p.m. on the night of the crime wearing a pair of beige pants. She went to bed at 10:30 or 11. She got up the next morning at about 4:45. Defendant was present in the bedroom and she did not know what time he arrived home. She further testified that she washed defendant's jeans later that morning and that prior to washing them she noticed some little spots on them.

On cross-examination Diane denied telling Robin Wren that defendant told her that he killed a woman. The prosecution subsequently called Robin Wren as a rebuttal witness. Defense counsel objected to Ms. Wren's testimony concerning conversations she purportedly had with Diane. The objection was overruled but, at the request of defense counsel, the following "limiting instruction" was given:

> "THE COURT: Ladies and gentlemen of the jury, the Court is instructing you at this time to consider any statements made by this witness that are of hearsay nature to be considered only for impeachment purposes, and not as to the truthfulness to the facts asserted. You may proceed."

Ms. Wren then testified that Diane told her that "she heard Steve tell John that he killed a woman."

At the conference on instructions defendant tendered an instruction

which would have informed the jury that its consideration of Robin Wren's testimony should be limited to impeachment. Upon objection by the State that the witness had been used in its case in chief and not solely for impeachment purposes, the tendered instruction was refused.

During his closing argument the prosecutor asserted:

"Now, she [Diane Strubberg] likewise told Robin Wren at that time that Steve had told her he had done it, number two, that she overheard this man in a telephone conversation where it was something to the effect of John—and this is the telephone call that both John Henderson and Jack Robertson testified to—John, I killed the old lady. Will you go back and get the bat. That is the substance and effect. You heard the testimony." ·

Thereupon, at the request of defense counsel, the court instructed the jury:

"Ladies and gentlemen of the jury, the Court has previously instructed you during the trial regarding certain testimony of Robin Wren, and that certain testimony referred to by the Court should be considered for impeachment purposes only and should not be considered as to the truth or falsity of the statement averred. Now at this time I am repeating that instruction regarding that particular testimony. You may proceed."

Following this the prosecutor again briefly referred to the conversations.

Defendant argues, and correctly so, that it constitutes error when a prosecutor presents evidence of a prior statement of a witness implicating a defendant in the crime being tried for the purpose of having the trier of fact consider such statement as substantive evidence rather than merely for the purpose of impeachment. (*People v. Bailey*, 60 Ill. 2d 37, 322 N.E.2d 804; *People v. Montgomery*, 51 Ill. 2d 198, 282 N.E.2d 138.) Defendant argues that reversible error occurred when the State presented evidence under the guise of impeachment that Diane Strubberg told Robin Wren that she overheard defendant say that he killed a woman; that the purpose in presenting such evidence was not to impeach the credibility of Diane Strubberg, but to inform the jury that Diane Strubberg stated that defendant admitted his guilt of the alleged offense.

■■ While it constitutes error to admit evidence of this nature we do not regard it as reversible in this case. The rebuttal testimony of Robin Wren did serve to impeach the testimony of Diane Strubberg in several particulars and was, of course, entirely proper for this purpose. Although in some parts it resulted in the erroneous admission of hearsay as defendant has pointed out, when the Wren rebuttal testimony is considered in its entirety it does not appear that the prosecutor was

engaging in a deliberate attempt to convict defendant by the use of the improper evidence. The Wren rebuttal testimony came after there had been one eyewitness account of the killing and competent testimony by two witnesses that defendant had on separate occasions admitted the killing to them. Thus, the improper testimony was but cumulative and could not under the circumstances have contributed to the verdict of guilty. This is all the more so since the court admonished the jury on two occasions that the testimony of Ms. Wren in question was to be considered for impeachment purposes only and not as evidence of guilt. The admonition was given as the testimony was being received and again when the testimony was referred to by the prosecutor in his final argument to the jury. The error must be deemed harmless. *People v. Goolsby; People v. Snell.*

The defendant next complains of the admission of the testimony of John Henderson concerning the conversation he had with Jack Robertson in which Robertson related to him the details of what had happened at the victim's house. Defendant contends that this testimony was hearsay, incorrectly admitted under the co-conspirator exception, as the conversation in question took place after the crime and was not in furtherance of a conspiracy to commit the crime. We must agree with the defendant that the testimony complained of does not fall within the co-conspirator exception to the hearsay rule. However, it does fall within a more general exception to the rule and as such was correctly admitted.

In a factual setting analogous to this, the supreme court had this to say regarding a hearsay objection in *People v. Carpenter,* 28 Ill. 2d 116, 121, 190 N.E.2d 738 (framed as a conversation which "occurred outside the presence of defendant"):

    " 'Hearsay evidence is testimony in court, * * * such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' (McCormick, Law of Evidence, sec. 225; see also, Cleary, Handbook of Illinois Evidence, sec. 31.1 *et seq.*) The fundamental purpose of the hearsay rule was and is to test the real value of testimony by exposing the source of the assertion to cross-examination by the party against whom it is offered. While the administration of an oath and the right of confrontation are also spoken of as necessary elements, the essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the act asserted. (Wigmore on Evidence, 3rd ed. sec. 1361, *et seq.; People v. Smuk,* 12 Ill. 2d 356.) If this requirement is met, with the exception of instances such as those where the silence of the defendant is claimed to constitute an

implied admission, the presence or absence of the defendant is immaterial."

Also see *People v. Williams*, 16 Ill. App. 3d 121, 305 N.E.2d 718; *People v. Hoffmann*, 124 Ill. App. 2d 192, 260 N.E.2d 351.

■■ Jack Robertson was present in court and testified with great similarity of fact to the incident as it was related by John Henderson. He was subjected to cross-examination by defense counsel. The requirements related in the *Carpenter* case were met and the testimony was properly received.

■■ Finally, the defendant argues that his sentence of 75 to 150 years on the murder conviction is excessive and should be reduced. The duty of a reviewing court is to determine whether the trial court properly exercised its discretion in imposing sentence. The trial court is in a superior position to make the determination as to the sentence and the authority of the reviewing court to reduce the sentence should be applied with considerable caution and circumspection. (*People v. Allen*, 56 Ill. 2d 536, 309 N.E.2d 544.) A court of review should not disturb the sentence unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose. (*People v. Taylor*, 33 Ill. 2d 417, 211 N.E.2d 673.) We find no abuse of discretion in the instant case. (*People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882.) The crime was utterly brutal and committed for no apparent reason. Further the defendant involved two others, youths only 14 and 15 years of age, in the crime. A court confronted with the nature and circumstances of this offense could legitimately conclude that anyone capable of committing it would need a great deal of time before becoming capable of re-entering society. See *People v. Nicholls*, 44 Ill. 2d 533, 256 N.E.2d 818.

Affirmed.

EBERSPACHER, P. J., and KARNS, J., concur.