THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HUBERT DAVID RICHMOND, Defendant-Appellant.

Fifth District   No. 77-72

Opinion filed April 5, 1979.

Michael J. Rosborough and Debra Knight Loy, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Raymond F. Buckley, Jr., and Ann E. Singleton, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE KASSERMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Madison County, defendant, Hubert David Richmond, was found guilty of murder, arson and burglary. He was sentenced to terms of imprisonment of 6 2/3 to 20 years for burglary, 6 2/3 to 20 years for arson and 50 to 100 years for murder. The sentences for arson and murder were imposed to run concurrently and consecutively to the sentence for burglary. On appeal, defendant asserts that he was denied a fair trial because of the jury's exposure to a certain exhibit and because of certain allegedly prejudicial remarks made by the prosecutor during his closing argument. Defendant also contends that the sentences imposed by the trial court were excessive and constituted an abuse of discretion.

The charges herein stem from the August 28, 1976, burglary and arson of the home of Teresa Kichler which resulted in her death. At trial, Detective Harris of the Granite City Police Department described the home of the decedent as he had observed it on the morning in question after responding to a call concerning a fire in the residence. Harris identified several photographs which had been taken of the interior of the home that morning, including photographs of a hole burned in the living room floor, of a burned mattress in the bedroom and of clipped telephone wires. He also demonstrated, by means of a drawing, the location of the items pictured as found inside the house. Granite City firemen, Tom Carmody and George Smolich, also related the facts surrounding the fire call. Carmody testified that after other firemen had kicked open the locked back door of the residence, he entered the house and observed it to be full of smoke. He described finding the body of the decedent lying on the floor and his determination that she no longer was alive. Smolich testified that the fire was not particularly difficult to extinguish and that it had burned a hole in the living room floor exposing a floor joist. He

related that a mattress in a bedroom of the residence was also on fire and that the circumstances of the fire caused him to suspect foul play. He also testified that the decedent had smudges and blood on her forehead.

Four youths who knew the defendant testified that defendant had related his involvement in the offense to them. Brian Kelley, age 16, testified that on August 28, 1976, defendant had told him he had robbed a house the evening before where he was confronted by an elderly woman with a knife who had stabbed at him and cut him. Defendant related to Kelley that he hit the woman in the head with a vase and an end table, cut the telephone wires and started a fire in the living room. Kelley also testified that defendant had said he was alone during the offense. On cross-examination, Kelley stated that he first gave this information to the police when they picked him up for questioning the day following defendant's arrest by the Granite City Police.

Rick Nelson, age 15, testified that defendant had stated to him on August 28, 1976, that he had "killed some old lady on Grand" after breaking into her home to steal some money. Defendant told Nelson that when the lady would not stop yelling, he threw a vase at her and beat her up. Nelson also admitted that he was questioned about the incident by the police.

Bobby Womack, age 18, testified that defendant had told him that he had hit the elderly woman after she came at him with a knife and that he subsequently hit her with a coffee table. Womack revealed that he too had been picked up by the police as a suspect in the case.

Susan Lance, age 18, also testified that defendant had admitted his involvement in the incident to her on the evening of August 28, 1976. She related that defendant had told her he had broken into the Kichler house with another person whose first name was Mark, and that she had supplied defendant the last name Carrico after defendant pointed out his accomplice to her. Lance further stated that defendant had told her Mark and he had broken into the house, clipped the telephone wires and entered the bedroom. When the elderly occupant screamed, Mark Carrico struck her in the head with a hammer. Defendant related to Lance that he ran away from the house after Carrico pulled a knife and told him to back off.

Testimony of other incriminating statements made by the defendant was elicited from Granite City police officers. When first questioned about the incident by Granite City Police Officers Eck and Knight, defendant denied any participation in the offense until he was confronted with the information supplied to the police by Lance. Defendant then admitted his involvement, stating that he and Carrico had entered the house through the back door where defendant clipped the telephone wires while Carrico asked the elderly woman for money. When Carrico continued to

strike the woman over defendant's objections, defendant left the house through the rear door. Detective Eck also testified that defendant had told the officers he was wearing the same clothing at the time of the offense that he had on while being questioned. The officers thereupon took the defendant's clothing, including a pair of brown engineering boots. Following his initial interrogation, defendant consented to giving a video-tape statement in the presence of Eck, Knight, Captain Condis and Detective Harris. In his statement, defendant described the house where the offense occurred and its contents. His account of the incident was substantially the same as his earlier statement; however, defendant denied having worn his brown engineering boots at the time of the offense. Defendant also stated that after leaving the house he looked back from several yards away and observed a dim light which could have been flames. During neither interrogation did defendant admit to striking the woman or starting any fires.

The following day, September 7, 1976, defendant gave a statement to Officer Harris after first being given *Miranda* warnings in his mother's presence. At that time defendant related to Harris that he went to the Kichler home on the day in question with Brian Kelley, who stayed outside while defendant entered the house alone. Defendant stated that he was immediately confronted by the decedent, who shined a flashlight at him and told him to leave. Defendant admitted that he took the flashlight from the woman, after a struggle, and hit her on the head with it, and that when the decedent fell to the floor, defendant lit a fire on a corner of the mattress in the bedroom and at another spot in the living room.

Detective Eck testified that defendant made another statement concerning his involvement in the incident on the afternoon of September 8, 1976. At that time defendant stated that he had lied about Mark Carrico and Brian Kelley's participation in the offense, but that he had told the truth to Susan Lance.

On the evening of September 8, 1976, defendant consented to participating in a video-tape re-enactment of the offense in the presence of Detectives Eck and Knight. During the re-enactment, defendant stated that he and Gary Catterson had decided to break into the decedent's home and that he gained entry by standing on a chair and climbing through a back window, whereupon he let Catterson into the house through the back door. After checking the refrigerator for something to eat, defendant approached the bedroom door, Catterson already having entered the room. On his way to the bedroom, defendant clipped the telephone wires, rifled through a table drawer in the living room and picked up a flashlight from the top of a table. Defendant stated that his purpose for entering the house was to look for money. At that point, Catterson left the bedroom, followed by the decedent, who shined a

flashlight in the defendant's eyes. Defendant then grabbed her hand and hit her in the head after which Catterson punched her in the jaw, causing her to fall. Defendant denied hitting the deceased after he struck her with the flashlight, but he admitted starting a fire in the bedroom by lighting a sheet while Catterson started a fire in the living room. According to defendant, the fire had been Catterson's idea of a method of disposing of the evidence. Defendant and Catterson then fled from the house leaving behind Mrs. Kichler, who was moaning. As a result of the trial court granting defendant's motion *in limine*, only the audio portion of the video tape re-enactment was played for the jury.

Officer Harris and Detective Knight identified photographs they had taken of the decedent's residence showing a chair located under the rear window, the furnishings of the house and the outside of the residence. Harris also identified a vial of blood taken from the defendant and given to the crime lab for testing.

Dr. Kun T. Liao, the pathologist who performed the autopsy on the decedent, testified that he found five lacerations on the head, a fracture of the skull bone and burns over 75 percent of her body. He stated that the immediate cause of death was smoke inhalation, with other injuries being contributing factors. Dr. Liao also identified a saliva sample and blood sample taken from the decedent.

Dennis Aubushon, a serologist with the State Bureau of Identification, testified that the saliva sample taken from the decedent indicated Type-A human blood as did the liquid blood sample taken from her. Aubushon related that his test of defendant's blood sample revealed that it was Type-O, while the test results of defendant's tan boot, which had been identified earlier by Detective Eck, indicated the presence of Type-A human blood. On cross-examination, Aubushon admitted he could not determine that the blood on the boot was from the same source as the blood from the decedent and stated that 40 percent of the population have Type-A blood.

During the State's case-in-chief, Officer McManus carried a cardboard box, approximately 17 by 15 inches, into the courtroom, the box being filled with evidentiary exhibits. The box had several markings on its outside surfaces, including the name "Kube" printed in bold, black letters across the top. McManus carried the box between the counsel table and the jury box, approximately 3 feet from the front rail of the jury box. The record indicates that the box was carried with the name "Kube" facing the bench and visible to the jury. After McManus gave the box to the bailiff, it was placed on the floor and the name "Kube" was not facing the jury. At defense counsel's request, the box was removed to chambers where he moved for a mistrial on the grounds that "Kube" was the name of an elderly couple who had been victims of an unsolved homicide in their Granite City home. The court noted that two of the jurors lived in

Granite City while another worked there; however, the court denied defense counsel's motion, stating that the jury was sufficiently instructed and that it believed there was nothing to attract the jury's attention to the box during its brief exposure. The court then heard testimony in chambers concerning the markings on the box and its chain of custody. Thereafter, the court ordered that the "Kube" box be placed inside a slightly larger box so that the markings would be concealed from the jury, and the State was told to instruct its witnesses not to refer to the name of the box.

The defense presented the testimony of Dr. Lawrence Taliana, the court-appointed psychologist who had examined defendant prior to trial. Dr. Taliana's testimony indicated that defendant had some difficulty understanding verbal communication and that he was in the borderline category between mild retardation and the low average range of intelligence.

During closing argument, the prosecutor remarked that one of the theories of the defense was, in essence, a general appeal to the sympathy of the jury in view of the defendant's youthful age of 18 years. Defense counsel's objections to this statement were overruled and the prosecutor continued by asserting that another theory of the defense was "nit picking" at the State's evidence.

The jury returned guilty verdicts to the charges of murder, arson and burglary. Defense counsel's motion for a new trial was denied.

At defendant's sentencing hearing, neither the State nor the defense offered evidence in aggravation or mitigation. The record reflects that the court carefully considered defendant's presentence report as well as several psychological evaluations of the defendant. At the conclusion of the hearing, the court sentenced defendant to 6 2/3 to 20 years for burglary, 6 2/3 to 20 years for arson, and 50 to 100 years for murder with the arson and murder sentences ordered to run consecutively to the burglary sentence.

Defendant initially contends that he was denied a fair trial by the jury's exposure to the exhibit box marked "Kube," which tended to connect him with the unsolved murders of an elderly Granite City couple who had been killed in their home approximately 9 months before defendant's trial. Defendant also argues that the inflammatory nature of the box was increased because of the overall weakness of the State's evidence of defendant's guilt. The People respond that the inadvertent exposure of the box to the jury for a period of several seconds did not require a mistrial nor prevent the defendant from receiving a fair trial. The State argues that defendant has not demonstrated any resulting prejudice, but only requests this court to speculate upon his assertions. In addition, the State contends that even if the brief exposure of the exhibit

was improper, defendant has not shown actual prejudice, especially in light of the overwhelming evidence presented at trial of his guilt.

■■ Our review of the record convinces us that the trial court acted properly in denying defendant's motion for a mistrial following the jury's brief exposure to the challenged exhibit. The trial court noted that nothing had been said about the box in the jury's presence, that no notice of it had been taken in front of the jury and that the jury's attention was not otherwise drawn to the box. Moreover, the trial court reasoned that it was highly unlikely the jury could draw an adverse conclusion from its observation of the exhibit in the face of the court's instructions and the admonitions given them in *voir dire*. We further note that defendant has failed to show any prejudice as a result of the inadvertent exposure of the box to the jury, but is instead asking us to make several unwarranted inferences. Defendant would first have us assume that one or more of the jurors actually saw the "Kube" box and further assume that the word "Kube" had some significance to those jurors, which would cause them to believe that defendant was connected to the other crime.

Defendant next complains that the prosecutor's remarks during the rebuttal portion of his closing argument were improper and prejudicial and resulted in denying him a fair trial. Specifically, defendant argues that the prosecutor's remarks disparaged defense counsel and the defense which was presented by implying that a jury trial was chosen only in the hope that one of the jurors would lack the courage to return a guilty verdict on such a young defendant. We disagree.

■■ Viewing the prosecutor's closing argument as a whole, we are of the opinion that he sought to admonish the jury not to be swayed by sympathy for the victim or for defendant, a topic of argument which is certainly proper. (*People v. Wright*, 56 Ill. 2d 523, 309 N.E.2d 537 (1974); *People v. Gregory*, 22 Ill. 2d 601, 177 N.E.2d 120 (1961).) Moreover, this line of argument was apparently made in response to defense counsel's repeated statements during his closing argument concerning the defendant's youth and low mental capacity. We also note that the prosecutor urged the jury not to shirk their duty, and he exhorted vigorous law enforcement and fearless administration of the law. These admonitions to the jury, when not made in an inflammatory manner, are also proper during closing argument. (*People v. Provo*, 409 Ill. 63, 97 N.E.2d 802 (1951).) We further find that the prosecutor's reference to defendant's defense as "nit picking" was not error where defense counsel spent much of his closing argument pointing out minor inconsistencies in the testimony of various State witnesses. Similar remarks which were challenged as being too critical of the defense were approved in *People v. Griggs*, 51 Ill. App. 3d 224, 366 N.E.2d 581 (1st Dist. 1977). In *Griggs*, the prosecutor pointed out the defendant's claim of a frame-up during trial

and defense counsel's focus on inconsistencies during closing argument were a defense strategy designed to "throw up a smoke screen" and "to cloud the whole issue." Moreover, if we were to judge the challenged remarks as improper, we do not believe that these remarks had a material effect on the jury. Where, as in the instant cause, there is clear and convincing evidence of guilt, such improper comments will not require reversal where it does not appear that they influenced the jury or that the verdict would have been otherwise had the remarks not been made. *People v. Harris*, 33 Ill. App. 3d 600, 338 N.E.2d 129 (3rd Dist. 1975).

Defendant's final contention concerns the length of his sentences. Defendant argues that because of the severity of the length of the consecutive sentences imposed, allegedly in disregard of his age and potential for rehabilitation, the trial court has, in effect, usurped the function of the parole board.

■■ Both the State and defendant agree that imposition of consecutive sentences was permissible for the offenses upon which defendant was convicted. (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4.) The trial court stated that the sentences should be imposed consecutively in order to protect the public from further criminal conduct by defendant, basing its determination on the presentence report and other materials before it. Although the State did not produce any evidence in aggravation, they reminded the trial court of the aggravating circumstances of the offense itself. According to various statements of the defendant, he struck his victim in the head, set fire to her home and clipped the telephone wires, thus preventing her from calling for help. We are in agreement with the State that the offenses committed were senseless and brutal. Defendant presented no evidence in mitigation, nor did he express any remorse for his conduct. The fact that a defendant is of a youthful age is of no consequence when a sentencing court determines that a lengthy term is warranted. (*People v. Strubberg*, 61 Ill. App. 3d 521, 378 N.E.2d 191 (5th Dist. 1978).) The remarks of the trial judge at defendant's sentencing hearing clearly indicate that he bore no personal ill towards the defendant; rather, the trial judge carefully determined and believed that defendant was incapable of rehabilitation and that he should remain in the penitentiary or some other institution for the rest of his life. We find no abuse of discretion in the instant case. *People v. Perruquet*, 68 Ill. 2d 149, 368 N.E.2d 882 (1977).

For the reasons stated, we affirm the judgment of the circuit court of Madison County.

Affirmed.

G. MORAN, P. J., and KARNS, J., concur.