2021 IL App (2d) 190986-U
No. 2-19-0986
Order filed October 27, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CM-966 |
| MICHAEL P. FERNSCHUSS, | ) ) | Honorable Marcy L. Buick, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: At defendant's trial for domestic battery, the trial court properly admitted, as excited utterances, the victim's statements to a 911 operator reporting that defendant shoved her during an argument. Also, defense counsel was not ineffective for failing to object to the State's closing argument, which defendant claims wrongfully insinuated that the jury could consider the victim's prior inconsistent statements as substantive evidence. There was no prejudice from counsel's failure, because (1) any potential wrongful implication was cured by the jury instructions making clear that the statements were admissible for impeachment alone; and (2) the evidence against defendant was compelling.

¶ 2    Following a jury trial, defendant, Michael P. Fernschuss, was found guilty of domestic battery based on insulting and provoking contact (720 ILCS 5/12-3.2(a)(2) (West 2018)) and

sentenced to 18 months' conditional discharge. On appeal, defendant argues: (1) the trial court committed plain error by admitting as excited utterances the victim's hearsay statements to a 911 operator or, alternatively, that defense counsel was ineffective for failing to preserve the issue for review; and (2) defense counsel was ineffective for failing to object to comments made by the State during closing argument, which, according to defendant, improperly treated the victim's prior inconsistent statements as substantive evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with two counts of domestic battery (*id.* § 12-3.2(a)(1), (a)(2)), stemming from an incident that took place between defendant and the victim, Emily Thedford, on September 23, 2018. According to the charges, defendant, using two closed fists, pushed Thedford on the face, causing her to fall backwards.

¶ 5      Before trial, the State filed a motion *in limine*, seeking to admit into evidence certain statements by Thedford during her phone call to 911. According to the motion, during the call, Thedford made statements, including but not limited to:

> "a. We were arguing and he had all his stuff outside. I asked him to stay outside
> and he got made [*sic*] about dinner. He was wanting to take food and other things that did
> not belong to him and because I wouldn't let him take the food he got in my face.
>
> b. He used both of his fists and basically fist bumped me with both of his fists closed
> in my face and was shoving me around."

The State argued that the statements qualified under the excited utterance exception to the hearsay rule.

¶ 6      At the hearing on the motion, the State argued that Thedford made the call "very shortly after this incident occurred." The State argued that (1) there was no time for Thedford to fabricate,

(2) Thedford was still under the presence of the startling event, and (3) Thedford provided details of the occurrence. Defense counsel responded: "I would be arguing that this is not an excited utterance, that you can hear in Ms. Thedford's voice, in her demeanor, in her conversation with the 911 dispatchers that this is not an excited utterance. You've had the opportunity to listen to the 911 call and we would be objecting to its admissibility."

¶ 7     The court ruled as follows:

"I did listen to this a couple of times and one thing that I'm finding to be true with these 911 calls is that while the caller is trying to describe what is happening, the operator is continually interrupting that person to ascertain where are you located, what is your name, what is the other person's name, so the caller is—and it's true in this situation, she's really trying to tell the operator what just happened and she's being interrupted. I understand why they need that information, but it doesn't take away from the essentially blurting out of what just happened allegedly.

And in this particular case it's clear from the call that she, the caller, is agitated, she's upset, she sounds kind of angry to me. She's describing an event that just happened because a little bit later in the phone call she says he just left, so it was happening—she made the call that seems right after this happened, and she's describing what happened to her allegedly, and I believe it falls into an excited utterance.

Now, as to the timing, if I have this right, the call starts at 3:29:48 and I listened I would think up to 3:31:16 is the time frame."

The court commented that the segment it identified "includ[ed] the statements, 'He bounced me up the fucking wall. He would not give me my keys back. He just left.' " The court instructed the parties to "review that timing."

¶ 8     The matter proceeded to trial, at which the State presented the following relevant evidence. Pamela Zynda testified that, on September 23, 2018, she was working as a 911 operator for the Sandwich Police Department when she received a call from Thedford. Zynda identified People's exhibit No. 1 as a fair and accurate copy of the 911 call that she received. Over defense counsel's objection, the court allowed the exhibit into evidence. The State played it for the jury. The call went as follows:

"THEDFORD: He used both of his fists and basically fist bumped me with both of his fists closed in my face—and was shoving me around—bouncing me off the fucking wall.

DISPATCHER: Okay. And what is your phone number, [Thedford]?

THEDFORD: ***-***-****.

DISPATCHER: Okay. I'll—

THEDFORD: He would not give me my keys back either, and he [unintelligible] does have my keys with him.

DISPATCHER: Okay."

The State noted that the audio recording began "at one second on the video counter" and "ended at 28 seconds." Zynda provided no further testimony.

¶ 9     Thedford testified that defendant was her "significant other" and they currently lived together. They had been in a relationship "[h]ere and there" for "[g]oing on four years." Thedford had two children, ages 21 and 5. When asked whether she remembered September 23, 2018, Thedford responded: "I don't remember dates offhand." Thedford agreed that, in September 2018, she lived in an apartment in Sandwich with defendant and her five-year-old son. At some point in September, Thedford called 911 to report a domestic battery incident. When asked what incident

led to the call, Thedford testified: "I was upset and overwhelmed from not being listened to and I let my emotions get the best of me and he was—I thought he was going to leave and I didn't want him to leave." Thedford testified that she thought that she had seen defendant's personal belongings in the back of her pickup truck. She testified further: "There was a Bears game playing that day. We didn't talk a whole lot. I was in my own mood." Thedford denied that defendant had made physical contact with her that day.

¶ 10    Thedford testified that the police arrived after she called 911. Defendant was not present when the police arrived. Thedford had a conversation alone in her kitchen with Sandwich police officer Joseph Kieca. When asked whether she recalled the conversation, Thedford responded: "Lightly perhaps." Thedford did not recall whether she told Kieca that she saw defendant loading his personal belongings into the back of her truck. When asked whether she told Kieca that defendant might be trying to leave in her vehicle and that defendant did not have a valid driver's license, Thedford responded, "The thought had crossed my mind," and "That sounds like something I would say."

¶ 11    Thedford testified that she did not recall whether she told Kieca any of the following: that (1) an argument ensued between Thedford and defendant when Thedford went outside and confronted him about leaving in her vehicle; (2) defendant told Thedford that he was going to leave and have a friend pick him up; (3) defendant unloaded the items from Thedford's pickup truck and went back inside where he began collecting his belongings from the apartment; (4) Thedford became upset because defendant started taking food and beverages from the kitchen that did not belong to him; (5) defendant argued with Thedford, telling her that the items were his; and (6) defendant stormed out of the apartment, leaving the food on the counter. Thedford was asked whether she told Kieca that, as she began putting the items away, she lost her balance and knocked

a leg of lamb into the sink, ruining it. She responded: "No. I carried it over to the sink to drain it and that's when the pan tipped over in the sink because I had burned both of my hands because it was done cooking and I wanted to cut it up." When asked whether she told Kieca that defendant, after seeing the food in the sink, blamed her for ruining the food on purpose, she responded: "I was worried that he was going to. I was already emotionally overwhelmed."

¶ 12    Thedford further testified that she could not recall whether she told Kieca any of the following: (1) after seeing the ruined food, defendant reached towards her with two closed fists, placed those fists against each cheek on her face, and pushed her forcefully backwards; (2) she then fell into the refrigerator; (3) she told defendant that he needed to leave; and (4) she grabbed the spare keys that defendant used to access the apartment. Thedford could not recall if she told Kieca that defendant told her to give him the keys, that defendant followed her into the hallway, that defendant grabbed her and struggled with her for control of the keys, that she dropped the keys so that defendant would leave her alone, and that defendant took the keys, stating, " 'You'll get them back when I get my stuff.' " Thedford did not recall telling Kieca that defendant then left in a minivan driven by his friend. Thedford did not recall telling Kieca that the force of the push and the ensuing struggle caused her to urinate in her pants. When asked whether she told Kieca that she had changed her pants, she testified: "I had wet myself. I had changed my pants. It started as soon as I burnt both of my hands at the sink." Thedford did not remember Kieca preparing a written summary of the occurrence and asking her to review and sign it.

¶ 13    Thedford testified that, on the day after she called 911, she went to the Sandwich police station and had photographs taken of two bruises on her right arm that she received the day before. When asked whether she had told the officer that the bruises were from the domestic incident that had happened the day before, she responded: "I wasn't sure if they were from that day from the

loft bed and I thought it would go along with what I had said before and I don't recall all of my words so."

¶ 14    Thedford testified that, on October 3, 2018, she wrote a letter to the State's Attorney's office. Thedford requested that she be allowed contact with defendant because they "were a family unit" and for financial and health care purposes. Thedford was shown People's exhibit No. 2, a copy of her letter, and she agreed that she did not state in the letter that the incident had not occurred. She testified that, although defendant was not her son's biological father, he was his father.

¶ 15    On cross-examination, Thedford testified that she called 911 on a Sunday. Defendant and his friend, Bob Lynch, watched the Bears game in the garage while Thedford was in the apartment putting together a loft bed for her son. Thedford had had a few beers earlier in the day, as did defendant and Lynch. At one point, defendant and Lynch had gone to the store to purchase items she needed for the bed. When they returned, Thedford was upset. She testified: "[W]e had not been speaking because I was in my own mood and irrational in my own thinking and in my own world." She was also upset because, while they were gone, the loft bed fell and hit her arms, head, and back. She had been frustrated before she began to assemble the bed. Working on the bed alone added to that frustration, especially since defendant was a handyman. Thedford did not recall whether defendant and Lynch had offered to help her assemble the bed when they returned from the store.

¶ 16    Thedford testified that she could see defendant and Lynch through the kitchen window standing by the pickup truck. She went outside to confront him and "raised [her] voice." Defendant threatened to leave, and she went back inside "because [she] wasn't being listened to and it added to escalation of [her] emotions." While carrying a pan of lamb roast from the oven to the sink, she

burned her hands. This caused her to dump a portion of the roast into the small sink. Thedford could not recall whether defendant accused her of dumping the roast on purpose. Thedford testified that she could not recall arguing with defendant, though she was upset at the time. Thedford did not recall if defendant had grabbed the spare keys. Thedford could not recall when defendant was picked up or who picked him up, but he did not leave in her truck. Thedford did not want defendant to leave; he had moved out temporarily in the past. Defendant never touched her that day. Defendant was not the reason that she urinated in her pants. Thedford testified that she has problems "[h]ere and there" with holding her urine.

¶ 17 Defense counsel asked Thedford about the health reasons she had referred to in the statement that she had written to the State's Attorney's office. Thedford testified that she was involved in every part of defendant's cancer treatment, and recalled filing a motion with the court on October 3, 2018, requesting contact with defendant. However, when asked whether her motion requested dropping the charges, she stated that she could not recall.

¶ 18 Thedford testified that, when she called 911, an officer responded, and she invited him in. She did not recall if the officer had taken pictures of her that day. The day after she called 911, she went to the police station at the request of the State's Attorney's office to have pictures taken. An officer photographed bruises on her forearm and bicep. Thedford testified that she had high blood pressure, which could make her face turn red.

¶ 19 Thedford testified that she went to the Sandwich police station in December 2018 so that she could "tell them the truth that what [she] had said before [(in September)] was incorrect." Thedford told the officers that she had been "emotionally overwhelmed and upset" and that she had "lashed out at [defendant]." She told the officers that defendant had never made physical contact with her. Thedford also told the officers that she had been previously on medication for

"depression[,] which had also helped with [her] being anxious, getting anxious or overemotional, what have you, and [she] wasn't on any medicine at the time." She further testified that, after September 2018, she began taking antidepressants again. Thedford testified that no one went with her to the police station in December 2018 or made her make the statement.

¶ 20    On redirect examination, Thedford could not recall whether she ever told Kieca that she had problems holding her urine or that a loft bed had fallen on her. Thedford could not recall whether she told the officer who had taken her pictures at the police station that a loft bed had fallen on her. Thedford did not see any reference to the loft bed in her October 3, 2018, letter.

¶ 21    Kieca testified that he was dispatched to Thedford's residence "for a domestic battery that had just occurred." Thedford "appeared very agitated, excited, kind of in distress." She did not appear to be under the influence of drugs or alcohol. During the conversation, Kieca learned that Thedford and defendant were in an "on-again-off-again relationship" and had been living at the apartment together for about two months. Kieca testified that Thedford told him the following. Thedford and defendant had been arguing throughout the day over various issues built up over the past few months. Thedford saw defendant loading her pickup truck with his belongings. She believed that defendant was trying to leave even though he did not have a valid driver's license. Thedford went outside and confronted defendant, at which time an argument ensued. Defendant told Thedford that he was going to have a friend pick him up and leave. Defendant began to remove his belongings from her truck. Thedford went inside, and defendant followed her. Defendant started to remove items from inside the apartment, including food and drinks. When Thedford told defendant that the items belonged to her, he stormed out. As Thedford began to put the items away, she lost her balance and dropped a leg of lamb into the sink, ruining it. When defendant returned to the kitchen, he accused Thedford of destroying the food on purpose. Defendant reached toward

Thedford with two closed fists, placed his fists against each cheek on Thedford's face, and pushed her forcefully backward, causing her to fall into the refrigerator. Thedford told defendant to leave, and she grabbed a spare set of keys that defendant used to access the apartment. Defendant demanded the keys. When Thedford refused to give them to him, defendant grabbed Thedford and struggled with her to get the keys. Thedford eventually dropped the keys on the floor so that defendant would leave her alone. Defendant took the keys and stated: " 'You'll get them back when I get all of my stuff.' " Defendant left in a minivan driven by a friend. After defendant left, Thedford noticed that the force of the push and subsequent struggle caused her to urinate in her pants. Thedford told Kieca that she changed her pants before he arrived.

¶ 22    Kieca testified that he noticed redness on Thedford's face, cheeks, left ear, and neck. Thedford told him that she had high blood pressure, so she was unsure whether the redness was from the struggle or her condition. Thedford showed Kieca the urine-stained pants. Kieca observed a large wet spot on the pants consistent with someone having urinated in them. Thedford never told him that she had a condition that caused her to have trouble holding her urine. Kieca identified People's exhibit Nos. 3, 4, and 5 as photographs that he had taken of Thedford on the scene and People's exhibit No. 6 as a photograph of Thedford's wet pants.

¶ 23    Kieca testified that he completed a form entitled "the domestic violence form victim side." On the form, Kieca recorded (1) his observations of Thedford and the scene, (2) the statements she made to him, and (3) a summarized version of events as described by Thedford. Thedford reviewed the form and signed it. Kieca learned that defendant was headed to a location in Plano. Kieca went to that location and spoke with defendant. Defendant was arrested for domestic battery.

¶ 24    On cross-examination, Kieca identified Defense exhibit Nos. 1 through 4 as photographs he had taken at Thedford's apartment on September 23, 2018. Three of the photographs depicted

the hallway where the alleged struggle over the keys had occurred. Kieca agreed that nothing appeared broken or knocked out of place or otherwise indicated that a struggle had occurred. The fourth photograph showed the kitchen, including the refrigerator and sink. There were magnets and papers on the refrigerator, and nothing appeared to be knocked down or disheveled. There was a cooking pan in the sink. Nothing in the kitchen showed any signs of a struggle. Kieca never asked Thedford where she was when she urinated in her pants; she did not have the pants on when he arrived. Kieca noticed redness on Thedford's cheeks, neck, and ear, but Thedford told him that it could have been from high blood pressure. Kieca did not observe any scratches, cuts, or bruises on Thedford, and she reported no injuries. Thedford's clothing was not torn or stretched. Kieca did not get defendant's version of the events before arresting him. Kieca did not observe any scratches, cuts, or bruises on defendant. Defendant's shirt was not torn.

¶ 25    On redirect examination, Kieca testified that he was unfamiliar with Thedford's apartment and did not know how it usually looked. Kieca testified that there was enough time for Thedford to change her pants and straighten items before his arrival. Kieca testified that he had 12 years of experience as a police officer. According to Kieca, not every domestic violence incident impacted the physical surroundings in the location where it occurred. Kieca further testified that he did not always observe marks, scratches, or scrapes on the victim in a domestic violence investigation.

¶ 26    Sandwich police officer Robert Russell testified that he met with Thedford at the police station on September 24, 2018, at about 1 p.m. According to Russell, Thedford "wanted to get pictures taken of the bruising she received from a domestic she had the previous night." Russell observed a large bruise on Thedford's right bicep and a smaller bruise on her right forearm. Russell identified People's exhibit Nos. 7 and 8 as the photographs that he had taken.

¶ 27   On cross-examination, Russell testified that the De Kalb County State's Attorney office had advised Thedford to have photographs taken of her injuries. Russell agreed that no scratches or cuts could be seen anywhere on Thedford in the photographs that he had taken. Russell did not observe any redness on Thedford's face or neck.

¶ 28   At the close of the State's case, the trial court denied defendant's motion for a directed verdict. Defendant presented no evidence.

¶ 29   The State began its closing argument by quoting Thedford's statements during the 911 call. The State argued that, on September 23, 2018, Thedford called the police to report a domestic battery. When the police arrived, they observed redness on Thedford's face, neck, and ear. The State pointed to the photographs in support. The State noted Russell's testimony that Thedford went to the police station the next day to report a domestic battery and that he observed bruises on her arms. The State also referred to the various statements by Thedford. The State argued:

"Now, you've heard a lot of statements, ones from Emily the 911 call around a year ago versus what she's telling you today. She couldn't remember a lot but she was telling you what she could remember. You also heard statements, too, from the two officers that are here today. *** Officer Russell said that those injuries (unintelligible) asked the victim she said it was from a domestic violence dispute. Also Officer Kieca talked about how the victim had told him that she had been pushed, that there was fists to her face, that she had to change her pants prior to his arrival.

And then you heard some disturbing things from the victim today, too, talking about—a lot of talk about the lamb roast that kind of maybe had set off a trigger to this whole thing. She said she was worried he was going to blame her, worried. She was worried that when he came in he was going to blame her for that. She told the officers, too, that he

did blame her for ruining that roast, so it's up to you to decide the credibility of Emily Thedford from statements that were given back a year ago to statements that were given now. Time has passed."

The State pointed out that, in December, Thedford resumed contact with defendant and "chang[ed] her opinion about what happened." The State argued that defendant and Thedford were still in a relationship, that they would be going home together after the trial, and that she did not want him to leave her. The State argued that Thedford was trying to protect defendant because she cared about him.

¶ 30    Defense counsel argued: "Now we know there were statements that were made on September 23, 2018, by Ms. Thedford. We know that she testified before you today and she seems not to recall." Counsel also pointed out that Thedford made a statement to the State's Attorney on October 3, 2018. Counsel argued that Thedford and defendant were not in a dating relationship in December 2018 when she went to the Sandwich police station and told them that she had lied, that defendant had never touched her, and that no altercation had occurred. Counsel stated: "Now, whether Ms. Thedford was telling the truth on September 23, on October 3rd, in December or here today that's up for you to decide. This is where your common sense comes in." Counsel pointed to Thedford's testimony that she made the call because she "was elevating her own emotions and she took it out of proportion." Counsel argued that there was nothing about Thedford's physical appearance or the scene to show that any type of struggle took place.

¶ 31    In rebuttal, the State argued that Thedford and defendant were still in a relationship. The State asserted: "She may not want to answer my questions. She may even try to change her statements from what she told the officer that night." The State pointed to defense counsel's request

that the jury use their common sense. The State reminded the jurors that, if you care about someone, you might say something to your detriment to protect them. The State continued:

"[Y]ou can use your common sense and I think you all know from your day-to-day life that if you care for someone, you don't want to see that person get in trouble. You may actually say something to the detriment of yourself to keep that person from getting into trouble.

Now, how can you look at the evidence in this case and see that? Well, consistency matters. On September 23rd she calls 911. You heard the statements that she told the 911 operator. Co-counsel recited them for you. 'He used his two fists. He put them on my face. He was pushing me around. He pushed me up the wall. He took my keys. He's left.'

Emily tells that exact same set of facts to [Kieca]. That officer gave you quite a lot of information in his testimony today, a lot of details and I want you to consider that. Emily doesn't recall a lot of what happened that day. I think you can judge for yourself that maybe she didn't recall as many questions that I asked her as opposed to when defense counsel was asking her questions, but what [Kieca] told you was that Emily told him that when he arrived she was agitated. She was upset. You can hear that on the 911 call. She's upset. She clearly wants someone to respond. She's telling the person and she sounds upset. There's no way around it. She tells [Kieca] what happened to her. She gives it to him in detail. 'He put his hands one fist on each side of my face. He pushed me backwards. I fell into the refrigerator.' "

¶ 32    The State also pointed out that Thedford, "with consistency," admitted that she brought a motion on October 3, 2018, seeking to have the no-contact order dropped. The State further noted that Thedford never said that what she reported was not true, but only that she wanted the charges

dropped. The State reminded the jury to consider Thedford's motive—that she was currently in a relationship with defendant. The State commented: "You have three consistent statements September 23rd, September 24th, October 3rd and they're all made to different people: Officer Kieca, Officer Russell and the State's Attorney's office." The State next directed the jury's attention to Thedford's first inconsistent statement, which was made in December when she told Sandwich police officers that defendant never touched her, and the fact that, thereafter, she and defendant resumed their relationship. After extensively discussing the remaining evidence, the State concluded:

"Ladies and gentlemen, Emily was consistent up until December that she had contact with this defendant again. I want you to pay attention to the things she said, give the weight you feel [is] appropriate to them and I believe when you do so you will find the defendant guilty of domestic battery."

¶ 33 During the jury instruction conference, the State proposed a modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.11, (4th ed. 2000) (IPI Criminal 4th), which guides the jury on using prior inconsistent statements. The State expressly indicated that "the impeachment in this case is with limitation. It was for impeachment purposes and not as substantive evidence), so the State would be asking that [IPI Criminal 4th No. 3.11] be given as modified." The court instructed the jury as follows:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

It is for you to determine whether the witness made the earlier statement, and, if so what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."

See IPI Criminal 4th No. 3.11

¶ 34    The jury found defendant guilty of domestic battery based on insulting and provoking conduct (720 ILCS 5/12-3.2(a)(2) (West 2018)) and not guilty of domestic battery based on bodily harm (*id.* § 12-3.2(a)(1)).

¶ 35    Defendant filed a motion for a judgment notwithstanding the verdict or, alternatively, for a new trial, arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt and that defendant's arrest was unlawful. The trial court denied the motion.

¶ 36    The trial court sentenced defendant to 18 months' conditional discharge.

¶ 37    This timely appeal followed.

¶ 38                                   II. ANALYSIS

¶ 39    A. Admissibility of Thedford's Statements to the 911 Operator as Excited Utterances

¶ 40    Defendant first argues that the trial court erred in admitting Thedford's statements to the 911 operator as excited utterances. Defendant acknowledges that he has forfeited the issue by failing to include it in his posttrial motion. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009) (to preserve a claim of error, defense counsel must object at trial and raise the issue in a posttrial motion). Nevertheless, defendant urges us to reach the issue under the plain-error rule. Alternatively, defendant argues that defense counsel was ineffective for failing to preserve the issue for review. The State responds that defendant's argument fails because there was no error.

¶ 41    Under plain-error review, we will grant relief to a defendant on an otherwise forfeited issue in either of two circumstances: (1) if the evidence is so closely balanced that the error alone

threatened to tip the scales of justice against the defendant or (2) if the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The plain-error rule is a narrow and limited exception to the general waiver rule. Its purpose is to protect the defendant's rights and the integrity and reputation of the judicial process. *Id.* at 177. Here, defendant argues first-prong plain error. Defendant cannot show plain error under either prong without first showing error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 42    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶ 43    " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Although hearsay is generally inadmissible (see Ill. R. Evid. 802 (eff. Jan. 1, 2011), various exceptions exist, including an exception for a statement deemed to be an excited utterance. See Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.*

¶ 44    For a hearsay statement to be admissible under the excited-utterance exception, the court must find that (1) there was "an occurrence sufficiently startling to produce a spontaneous and unreflecting statement," (2) there was "an absence of time for the declarant to fabricate the statement," and (3) the statement "relate[s] to the circumstances of the occurrence." *People v.*

*Sutton*, 233 Ill. 2d 89, 107 (2009). Courts use a totality-of-the-circumstances analysis to decide whether a statement is admissible under the excited-utterance exception. *Id.* Courts consider several factors, including the passage of time, the declarant's mental and physical condition, the nature of the event, and whether the statement is in the declarant's self-interest. *Id.*

¶ 45     "Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the court has abused that discretion." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion will be found only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 46     Defendant contends that, based on the totality of the circumstances, Thedford's statements to the 911 operator cannot be considered excited utterances. Defendant argues that (1) "the record is silent as to when the alleged incident occurred, or to how much time elapsed between the incident and Thedford's statements"; (2) Thedford's mental and physical condition lessened the statements' reliability; (3) the nature of the event "appears to be the culmination of a series of events," "rather than a single, startling event," and thus was not capable of producing a spontaneous, unreflecting statement; and (4) Thedford had a clear motive to fabricate her statements.

¶ 47     Before addressing defendant's arguments, we note that, as the State points out, the record on appeal does not contain the entire 911 recording that the trial court reviewed before granting the motion. The court commented that the recording it reviewed was about one and a half minutes long. However, People's exhibit No. 1—which was played for the jury and is contained in the record—is just under thirty seconds in length. Defendant, as the appellant, bears the burden of providing a sufficient record on appeal. In the absence of such record, we must presume that the court's ruling on the evidence was in conformity with the law and had a sufficient factual basis.

*Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-21 (1984). If any doubt arises from incompleteness of the record, we will resolve it against the appellant. *Id.* at 392.

¶ 48    Defendant argues in response that the record is sufficient. According to defendant, "because the court found the entire call admissible[,] the State's exhibit presumably included all relevant portions of the call." Defendant further contends that, even assuming *arguendo* that the State's exhibit does not contain the entire recording, the State described Thedford's statements on the record. Moreover, the trial court explained on the record what it heard in the recording that was relevant to its ruling.

¶ 49    Contrary to defendant's argument, we will not presume that the exhibit included all relevant portions of the call, where the trial court specifically noted that the call was almost one and a half minutes in length. In addition, although the State described some of the statements that Thedford made at the motion hearing, we have no way of knowing what else, if anything, was said. Thus, to the extent that the court relied on aspects of the recording not before us, we presume they supported the court's ruling.

¶ 50    We turn now to defendant's arguments. Defendant's first argument centers around the timing of the call, *i.e.*, whether it was sufficiently spontaneous. See *People v. Smith*, 152 Ill. 2d 229, 260 (1992) (quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 803.3, at 627 (5th ed. 1990)) (The critical inquiry is " 'whether the statement was made while the excitement of the event predominated.' "). According to defendant, there was no evidence as to when the alleged incident occurred, because "from listening to the call[,] it is not apparent that Thedford makes the statement that [defendant] 'just left.' " Defendant also argues that Thedford did not sound overcome with emotion or excitement but, instead, sounded angry, which showed

that her statement was not made while the excitement of the event predominated. These arguments fail.

¶ 51    The trial court, after listening to the *entire* 911 call, specifically found that it was

"clear from the call that [Thedford] is agitated, she's upset, she sounds kind of angry to me. She's describing an event that just happened because a little bit later in the phone call she says he just left, so it was happening—she made the call that seems right after this happened, and she's describing what happened to her allegedly, and I believe it falls into an excited utterance."

To be sure, in the 911 call played for the jury, Thedford cannot be heard to say that defendant "just left." However, as noted, the record does not contain the entire call; thus, we must construe any doubts arising from the incompleteness of the record against defendant. That is, we presume that the missing portion of the recording supports the court's finding and contains Thedford's statement that defendant "just left." We also presume that the missing portion of the recording supports the trial court's finding as to Thedford's demeanor during the call. In any event, the portion of the 911 call in the record supports the court's ruling—Thedford most certainly sounds shaken and upset. Defendant, however, contends that the trial court's comment that Thedford sounded "angry" undercuts the court's findings in support of admission. Citing *People v. Merideth*, 152 Ill. App. 3d 304, 313 (1987), defendant argues that "anger does not 'still the capacity for reflection' or curb 'conscious fabrication.' " However, *Merideth* does not support the proposition that a statement from an angry declarant cannot be an excited utterance. Indeed, one can certainly be "agitated," "upset," and "kind of angry" at the same time.

¶ 52    Defendant next argues that Thedford's physical and mental condition disfavor admission of her statements as excited utterances. We disagree. Defendant argues that Thedford's drinking

before the 911 call casts doubt on the reliability of her statements. See *People v. Green*, 179 Ill. App. 3d 1, 19 (1988) (the fact that declarant was smoking marijuana and " 'getting high' " when he overheard the statements at issue casts doubt on their trustworthiness). However, Thedford testified that she had only had a few beers earlier in the day. There was no evidence that she had been drinking at the time of the incident or that she was intoxicated. Indeed, Kieca testified that Thedford did not appear to be under the influence of drugs or alcohol. Defendant also points out that Thedford reported no injuries and did not seek medical treatment. However, he does not direct us to any cases holding that the admission of an excited utterance requires that the declarant suffer injuries or seek medical treatment. Indeed, "[a]n event can be sufficiently startling, even in the absence of physical injury, based on the totality of the circumstances." *People v. Connolly*, 406 Ill. App. 3d 1022, 1025 (2011).

¶ 53    Defendant's third argument concerns the nature of the event. Defendant argues that it was not " 'an occurrence sufficiently startling to produce a spontaneous and unreflecting statement.' " See *People v. Leonard*, 83 Ill. 2d 411, 418 (1980) ("[A]bsent some evidence of the existence of an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, the testimony relating the out-of-court statement should be excluded."). According to defendant, the incident was instead a "culmination of a series of events creating frustration between the parties." See *People v. Evans*, 373 Ill. App. 3d 948, 965 (2007) (holding that, although the issue was forfeited, where the parties had two prior confrontations in the same evening, the subsequent fight between them "[did] not qualify as the sort of dramatic, startling event capable of generating an excited utterance"). We disagree. There was no evidence that defendant and Thedford had any type of physical confrontation before defendant's act. The trial court could have reasonably concluded that, even if Thedford was "in her own mood" and emotionally "lashing out" at

defendant, defendant's ultimate act of "fist bump[ing] [Thedford] with both of his fists closed in [her] face—and *** shoving [her] around—bouncing [her] off the *** wall," was sufficiently startling. We note too that circumstantial evidence supports that the startling event occurred. See *Leonard*, 83 Ill. 2d at 419 (sufficient circumstantial evidence corroborated the occurrence of the startling event). Kieca testified that, when he arrived at Thedford's apartment, Thedford "appeared very agitated, excited, kind of in distress." Kieca noticed redness on Thedford's face, cheeks, left ear, and neck. Thedford showed Kieca her pants and he observed a large wet spot consistent with Thedford having urinated in them. Thus, defendant's argument fails.

¶ 54    Last, without any citation to authority, defendant argues that Thedford had "a clear motive to fabricate her allegations." He argues that Thedford was " 'frustrated' " and " 'upset' " with defendant, that defendant had threatened to leave earlier that day, and that Thedford " 'didn't want [defendant] to leave.' " Although "the presence or absence of self-interest" is a factor to consider in determining whether an excited utterance is admissible (see *People v. House*, 141 Ill. 2d 323, 382 (1990)), we fail to see how it could have been in Thedford's self-interest to make a false 911 report. In any event, the court could have reasonably rejected Thedford's testimony or found that, given the totality of the circumstances, this factor did not tip the scales in support of excluding the statement.

¶ 55    Based on the foregoing, we hold that the trial court did not abuse its discretion in admitting Thedford's statements to the 911 operator as excited utterances. Because we have found no error, there can be no plain error. See *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 38 (without reversible error, there can be no plain error). In addition, it follows that defendant's ineffective-assistance-of-counsel claim also fails because counsel's failure to raise the issue in his posttrial motion cannot constitute deficient performance and cannot result in prejudice to defendant. See

*People v. Hanson*, 238 Ill. 2d 74, 115 (2010) (where there was no error in the admissibility of the witness's testimony, counsel's failure to object cannot constitute deficient performance and cannot result in prejudice).

¶ 56    B. Ineffective Assistance of Counsel for Failing to Object to the State's Closing Argument

¶ 57    Defendant next argues that defense counsel was ineffective for failing to object to comments made by the State during closing argument, which, according to defendant, improperly treated Thedford's prior inconsistent statements to Kieca and Russell as substantive evidence. The State responds that an analysis of the entire closing argument shows that the prior inconsistent statements were properly used for impeachment of Thedford's trial testimony and, alternatively, that any error was harmless, because the statements could have been admitted as substantive evidence.

¶ 58    As already noted, under *Strickland*, to establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant, in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. See *People v. Jackson*, 2020 IL 124112, ¶ 90. Failure to establish either prong of the *Strickland* test is fatal to a defendant's claim. *Id.*

¶ 59    Where a defendant is alleging ineffective assistance of counsel based on counsel's failure to object to the State's remarks during closing arguments, "[t]he showing of *Strickland* prejudice *** is similar to the prejudice that establishes reversible error for improper prosecutorial remarks: whether the guilty verdict resulted from trial counsel's failure to object." *Id.* ¶ 91; see *People v. Runge*, 234 Ill. 2d 68, 142 (2009) ("Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks, and will find reversible error only if

the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error.").

¶ 60    "[W]hen a witness has previously made a statement and, at trial, testifies inconsistently with the statement, a party may introduce the witness's prior statement, the hearsay rule, notwithstanding, for the limited purpose of impeaching the witness's credibility." *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 44. "[T]he purpose of such impeachment evidence is to destroy the credibility of the witness and *not* to establish the truth of the impeaching material." (Emphasis in original.) *People v. Cruz*, 162 Ill. 2d 314, 359 (1994).[1]

¶ 61    Here, the parties do not dispute that Kieca's and Russell's testimony about Thedford's incident report was properly admitted to impeach Thedford's testimony. Kieca testified about what Thedford told him concerning the details of the incident. Russell testified that Thedford came to the police station the next day to have photographs taken "of the bruising she received from a domestic she had the previous night." Thedford's statements to Kieca and Russell were inconsistent with her trial testimony that defendant never touched her. In addition, when discussing

---

[1] As we recently noted in *Guerroro*, until 1984, the only proper purpose to introduce a witness's prior inconsistent statement was to impeach the witness's credibility. *Guerroro*, 2021 IL App (2d) 190364, ¶ 46. In 1984, our legislature enacted section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2018)), which allowed a party in a criminal case to introduce a witness's prior inconsistent statement as substantive evidence if certain requirements were met. Pub. Act 83-1042, § 1 (eff. July 1, 1984) (adding 725 ILCS 5/115-10.1); see also Ill. R. Evid. 801(d)(1)(A)(2)(b) (eff. Oct. 15, 2015) (codifying section 115-10.1 in the Illinois Rules of Evidence).

jury instructions, the State expressly indicated that "the impeachment in this case is with limitation. It was for impeachment purposes and not as substantive evidence), so the State would be asking that [I.P.I. Criminal 4th No. 3.11] be given as modified."

¶ 62    Defendant argues, however, that during closing arguments the State improperly treated Thedford's prior inconsistent statements as substantive evidence. According to defendant, the State improperly (1) "focused on the apparent consistency of Thedford's prior statements," (2) "treated all of Thedford's prior statements as substantive evidence," and (3) "argu[ed] for the truthfulness of the prior inconsistent statements." Further, "instead of clearly instructing the jury on the limited purpose of the impeachment testimony brought out at trial, the State further complicated the jury's task by telling the jury to give 'the weight you feel [is] appropriate' to Thedford's prior statements."

¶ 63    Here, in viewing the State's comments in the context of the parties' closing arguments as a whole, we cannot say that defense counsel's failure to object during the State's closing arguments prejudiced defendant. We first note that Thedford's 911 call had been properly admitted as substantive evidence and was not subject to the same restrictions as the prior inconsistent statements testified to by Kieca and Russel's testimony. The prior inconsistent statements here were offered for the sole purpose of impeaching Thedford's testimony. In that regard, the jury was instructed:

> "The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given the testimony you heard from the witness in this courtroom.

It is for you to determine whether the witness made the earlier statement, and, if so what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."

See IPI Criminal 4th No. 3.11.

During its initial closing arguments, the State properly told the jury that "it's up to you to decide the credibility of Emily Thedford from the statements that were given back a year ago to statements that were given now. Time has passed." The State talked about Thedford's relationship with defendant, noting that she cared about him, and stated: "We try to protect the people we care about even to our own detriment." The obvious implication was that Thedford was lying on the witness stand.

¶ 64     Arguably, there are a few portions of the State's rebuttal closing argument that made the purpose of Thedford's prior inconsistent statements less than clear. For instance, the State commented that "consistency matters," noting that Thedford told Kieca the same facts that she told the 911 operator. Prior inconsistent statements admitted for impeachment purposes should be compared against the witness's trial testimony. See *People v. Johnson*, 385 Ill. App. 3d 585, 608 (2008) ("Consistency is measured against a witness's trial testimony: inconsistent statements are inconsistent with trial testimony; consistent statements are consistent with it."). The State's comment arguably implied that what Thedford told Kieca was likely true given that it was consistent with the statements she made to the 911 operator. The State also emphasized the consistency between Thedford's prior inconsistent statements to Kieca and Russell. To be sure, there is no "blanket prohibition" against prior inconsistent statements that are consistent with each other (see *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 61 (quoting *People v. White*, 2011 IL App (1st) 092852, ¶ 52). However, the State's emphasis on the consistency of the prior inconsistent

statements with Thedford's 911 statements rather than on their inconsistency with Thedford's trial testimony made the purpose of the statements a bit confusing. But, at no point did the State expressly "argue[] that Thedford's prior statements to *** Kieca and Russell describing the incident were truthful." Instead, as noted, the State properly argued that it was the jury's role to decide whether Thedford's trial testimony was credible.

¶ 65    Nevertheless, even if some of the State's comments regarding Thedford's prior inconsistent statements did not clearly indicate that the purpose of those statements was to impeach Thedford's trial testimony, we cannot say that the guilty verdict resulted from defense counsel's failure to object during the State's argument. First, as noted, the trial court properly instructed the jury on the use of prior inconsistent statements. See *People v. Miller*, 363 Ill. App. 3d 67, 77 (2005) ("[O]ur supreme court has held that IPI 3.11 is 'sufficient to guide the jury in its deliberation and provide an adequate safeguard that the jury would not give substantive character to the impeachment testimony.' " (quoting *People v Bradford*, 106 Ill. 2d 492, 502 (1985))). The jury instruction was not confusing. Thedford's trial testimony was inconsistent with her prior statements to both Kieca and Russell. The jury instruction correctly explained that (1) a witness's credibility may be challenged by evidence that on some former occasion she made a statement that was not consistent with her testimony; (2) the jury could consider the statement only for the limited purpose of deciding the weight to be given the witness's trial testimony; and (3) the jury was to determine what weight, if any, should be given to the prior statement. Given the clear instructions, any possible prejudice was cured. See *People v. Simms*, 192 Ill. 2d 348, 396 (2000) (improper remarks made by the State during closing arguments may be cured by the trial court's proper instruction of the law to be applied). Although defendant argues that "the jury instructions in this case did not mitigate the prejudice caused by the improper use of Thedford's prior statements," the sole case

he relies on is distinguishable. See *People v. Montgomery*, 51 Ill. 2d 198, 207-08 (1972) (finding that the cautionary instruction was insufficient where (1) "the trial court permitted the cross-examination to go far beyond the limits of a proper foundation for impeachment and permitted the witness to testify to statements which could only have served to confuse and prejudice the jury" and (2) the trial court relied on the impeachment evidence in imposing sentence).

¶ 66    In addition, the evidence of defendant's guilt was strong. As noted, Thedford's statements to the 911 operator were properly admitted as substantive evidence. In those statements, Thedford described exactly what defendant had done. The jury heard testimony from Kieca, who arrived on scene in response to the 911 call and described Thedford as being "very agitated, excited, kind of in distress." Kieca also testified that he observed Thedford's urine-soaked pants. The jury saw photographs taken of Thedford at the scene and those taken the next day showing bruises to her body. The jury also heard evidence that defendant and Thedford had resumed their relationship and were again living together. This relationship allowed for a reasonable inference that Thedford was now lying to protect him.

¶ 67    Accordingly, given the evidence and the proper instruction on the use of the prior inconsistent statements, defendant has failed to establish that he suffered prejudice from defense counsel's failure to object during the State's closing arguments. Thus, his ineffective-assistance claim fails.

¶ 68                    III. CONCLUSION

¶ 69    For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 70    Affirmed.